# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

KLAIRE RUECKERT, individually and on behalf of all others similarly situated,

                                Plaintiff,

        v.

ZAAPPAAZ, INC. d/b/a WB Promotions, Inc., d/b/a Wrist-Band.com, d/b/a Customlanyard.net; AZIM MAKANOJIYA; CUSTOM WRISTBANDS INC. d/b/a Kulayful Silicone Bracelets, d/b/a Kulayful.com, d/b/a Speedywristbands.com, d/b/a Promotionalbands.com, d/b/a Wristbandcreation.com, d/b/a 1inchbracelets.com; CHRISTOPHER ANGELES; NETBRANDS MEDIA CORP. d/b/a 24hourwristbands.com, d/b/a imprint.com, f/k/a Lightbeam, Inc.; and GENNEX MEDIA, LLC d/b/a brandnex.com.

                              Defendants.

Civil Action No.: 4:17-cv-3607

## CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

## INTRODUCTION

Plaintiff Klaire Rueckert ("Plaintiff"), by her undersigned counsel, individually and on behalf of all others similarly situated, alleges the following against Defendants Zaappaaz, Inc. d/b/a WB Promotions, Inc. d/b/a Wrist-band.com d/b/a Customlanyard.net; Azim Makanojiya; Netbrands Media Corp. d/b/a 24hourwristbands.com, d/b/a imprint.com, f/k/a Lightbeam Inc.; Gennex Media, LLC d/b/a brandnex.com (collectively "the Houston Defendants"); Custom Wristbands Inc. d/b/a Kulayful Silicone Bracelets, d/b/a Kulayful.com, d/b/a Speedywristbands.com, d/b/a Promotionalbands.com, d/b/a Wristbandcreation.com, d/b/a 1inchbracelets.com; and Christopher Angeles (collectively "Defendants"); based, as to herself, on personal knowledge, and on information and belief in all other respects, based on the

1

investigation of counsel. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and based on a federal question, 28 U.S.C. § 1331.

## NATURE OF THE ACTION

1. This is a nationwide direct-purchaser antitrust action arising out of a conspiracy to fix prices for customized silicone wristbands, customized lanyards, and customized pin buttons. The conspiracy came to light as a result of recent guilty pleas by Defendants Zaappaaz, Inc. ("Zaappaaz"), Zaappaaz founder and president Azim Makanojiya ("Makanojiya"), Custom Wristbands Inc. ("Custom Wristbands"), and Custom Wristbands owner and CEO Christopher Angeles ("Angeles"). All recently pled guilty to price-fixing in violation of Section 1 of The Sherman Act, 15 U.S.C. § 1.

2. Customized promotional products are small, inexpensive items most often used by businesses or other organizations for promotional purposes, such as to advertise and market a given brand or piece of information. These products are generally imprinted with a brand name, slogan, person's name, or some other bit of text or imagery at the customer's request.

3. Individuals also purchase promotional products for various reasons, including the celebration of life events.

4. From at least June 2014 to at least June 2016, with anticompetitive effects continuing to the present ("the Class Period"), at least the Houston Defendants and Custom Wristbands used text messages and online messaging platforms, as well as meetings with co-conspirators, to fix and maintain prices for customized promotional products, specifically customized silicone wristbands, customized lanyards, and customized pin buttons.

5. In the press release describing the conspiracy, the U.S. Department of Justice said, ". . .[T]he defendants and their co-conspirators agreed. . .to fix the prices of customized

promotional products sold online, including wristbands and lanyards. In addition to agreeing to plead guilty, Zaappaaz has agreed to pay a $1.9 million criminal fine."[1]  Similarly, Custom Wristbands has agreed to pay a $409,342 criminal fine.[2]

6.       On August 7, 2017, Defendants Zaappaaz and Makanojiya indicated that they would agree to plead guilty to one count each of violating Section 1 of the Sherman Act.  Their re-arraignments are set for November 30, 2017.  *See USA v. Zaappaaz, Inc.*, Case No. 4:17-cr-477, S.D. Tex. and *USA v. Makanojiya*, Case No. 4:17-cr-478, S.D. Tex.

7.       On August 22, 2017, Defendants Custom Wristbands and Angeles indicated that they would agree to plead guilty to one count each of violating Section 1 of the Sherman Act. *See USA v. Angeles*, Case No. 4:17-cr-509, S.D. Tex. and *USA v. Custom Wristbands Inc.*, Case No. 4:17-cr-510, S.D. Tex.

**PARTIES**

8.       Plaintiff Klaire Rueckert is a natural citizen domiciled in Seattle, Washington. Plaintiff purchased customized silicone wristbands directly from one or more Defendants on multiple occasions during the Class Period.  Unbeknownst to Plaintiff, Defendants' price-fixing caused Plaintiff to suffer antitrust injury.

9.       Defendant Zaappaaz, Inc. is a privately-held Texas corporation with its principal place of business at 1305 El Camino Village Dr., Houston, Texas, 77058-3081.  Zaappaaz does business online under the names "WB Promotions, Inc.", "Wrist-Band.com" and "Customlanyard.net."

---

[1] https://www.justice.gov/usao-sdtx/pr/e-commerce-company-and-top-executive-agree-plead-guilty-price-fixing-conspiracy, last accessed Nov. 9, 2017.

[2] https://www.justice.gov/opa/pr/second-e-commerce-company-and-its-top-executive-agree-plead-guilty-price-fixing-conspiracy, last accessed Nov. 9, 2017.

10.    Defendant Azim Makanojiya is the president of Defendant Zaappaaz and is domiciled in the State of Texas.

11.    Defendant Netbrands Media Corp. ("Netbrands") is a Texas corporation with its principal place of business at 14550 Beechnut St., Houston, Texas, 77083-5741. Netbrands does business as, among other names, "24hourwristbands.com" and "imprint.com".

12.    On information and belief, Netbrands previously operated as Lightbeam Inc., a former Delaware corporation which had a principal place of business at 4850 Wright Rd., Suite 100, Stafford, Texas, 77477-4116. Lightbeam Inc. also did business as "lightbeamlabs.com".

13.    Defendant Gennex Media, LLC ("Gennex") is a Texas corporation with its principal place of business at 8181 Commerce Park Dr., Houston, Texas, 77036-7749. Gennex does business online under the name of "brandnex.com".

14.    Defendant Custom Wristbands Inc. ("Custom Wristbands") is a California corporation with its principal place of business at 4416 W. Verdugo Ave., Burbank, California, 91505. Custom Wristbands does business online under the names of "Kulayful Silicone Bracelets", "Kulayful.com", "Speedywristbands.com", "Promotionalbands.com", "Wristbandcreations.com" and "1inchbracelets.com".

15.    Defendant Christopher Angeles is the owner and chief executive officer of Defendant Custom Wristbands and is domiciled in the State of California.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to Sections 4 and 16 of The Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1. This Court also has original federal question jurisdiction over the Sherman Act claim asserted in this

Complaint pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of The Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are at least 100 members of the proposed class, at least one of whom is a citizen of a different state than Defendants, and the aggregate claims of the proposed class members exceed $5,000,000, exclusive of interest and costs.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because: Defendants Zaappaaz, Netbrands, and Gennex are all headquartered in this District; Defendant Makanojiya resides in this District; and Defendants transacted business in this District, were found with or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## RELEVANT MARKETS

19.     The Relevant Geographic Market is the United States.  Defendants operate websites which advertise and sell promotional products, including customized silicone wristbands, customized lanyards, and customized pin buttons, throughout the United States through the use of online platforms.

20.     Defendants' market share for customizable silicone wristbands, customized lanyards, and customized pin buttons is unknown.  Marketing information sufficient to determine market share is unknown or unpublished.  However, Defendants Zaappaaz, Netbrands, and Gennex each claim to be the largest seller of customized silicone wristbands, and on information and belief, the Houston Defendants, together with Custom Wristbands, account for at least 90% of the market for customizable silicone wristbands.

21.     The Relevant Product Markets are customized silicone wristbands, customized lanyards, and customized pin buttons.  Defendants Zaappaaz, Custom Wristbands, Gennex, and Netbrands compete for the sale of customized silicone wristbands.   Defendants Zaappaaz, Custom Wristbands, Netbrands, and Gennex compete for the sale of customized lanyards.  Defendants Zaappaaz, Netbrands, and Gennex compete for the sale of customized pin buttons.

22.     Customized silicone wristbands and customized lanyards are sold exclusively or nearly-exclusively over the internet to enable the highest degree of customization possible and the shortest order fulfillment time.  Some factors, such as wristband width and color, lanyard material and clip, and method of customization (e.g, embossment, debossment) are standardized across the industry.  Product offerings can be readily described using these features.  Customized pin buttons are frequently sold over the internet and are similarly customizable, both in size, color, and type of ink used in printing.  The customizable options for customized pin buttons are similarly standardized across the industry.

## INTERSTATE COMMERCE

23.     Defendants manufactured and/or sold customized silicone wristbands and customized lanyards in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

24.     Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

## FACTUAL ALLEGATIONS

**A.  The Market for Customizable Promotional Products**

25.     While promotional products in the United States date back to the presidential campaign of George Washington, the modern market for customizable promotional products began in the 1970s.

26.     Beginning in the early 2000s, much of the ordering for promotional products began to be done online, which, for the first time, allowed customers to easily compare the prices for ordering a given type of customizable promotional product according to one's need.  In turn, this required companies producing customizable promotional products to compete on price, types of products offered, quality, speed of delivery, and by feature.

27.     The customizable promotional products industry in the United States is a $22.9 billion industry.[3]

**B.  <u>The Ordering System for Customizable Wristbands, Lanyards, and Pin Buttons</u>**

28.     All corporate Defendants' ordering systems for customized silicone wristbands, and/or lanyards are highly similar: a customer begins by choosing a type of printing (such as printed or embossed), a width, a color, a customized message, logo, or picture, a method of bagging, and then the type or speed of shipping and/or production.  Customized pin buttons use a pre-set selection of sizes and shapes of buttons, upon which a custom image or message is printed.  Pin buttons can also be made with magnetic backs or as keychains.  The prices for all three products are clearly quoted at the bottom of the ordering screen, and are similar across Defendants' platforms.  It is very easy for customers to compare prices through entering similar or identical orders on Defendants' websites, and similarly, competitors can easily monitor each other's prices.

---

[3] *See* https://www.psi-network.de/en/Industry/US-promotional-product-market-The-South-leads-the-charge-in-sales/45/n6129/, last accessed Nov. 9, 2017.

29.    Competition, in a normal market, would be fierce, and would require extremely small margins and highly responsive customer service.  However, as evidenced by Defendants' Makanojiya and Zaappaaz's informations, in order to increase margins and reduce competition, Defendants opted not to compete on price and instead set prices via text messages, meetings, and social media messaging platforms.

### C.  Customized Silicone Wristbands

30.    Zaappaaz and Netbrands both claim to be the largest provider of silicone wristbands in the world, while Gennex advertises itself as the "largest manufacturer of custom wristbands in the world"[4].  Market share data for the silicone wristband market is not available, but to Plaintiffs' knowledge no other providers of silicone wristbands advertise themselves as being the largest,

31.    Silicone wristbands are extremely easy to produce, using extruded silicone rubber, which is compressed to a pre-selected width (most commonly one-half inch).  The rubber is pre-dyed, and the customer can select whether he or she wants the customized printing to be debossed (recessed), embossed (raised), colored debossed, or screen-printed, among other options.  Most silicone wristbands are 7 or 8.5 inches in circumference and are approximately one-tenth of one inch thick, and are heavily standardized across the industry.[5]

---

[4] *See* https://24hourwristbands.com/, last accessed Nov. 9, 2017 ("We are the largest manufacturer of custom wristbands in the world."); http://www.chron.com/business/bizfeed/article/Local-wristband-lanyard-maker-plead-guilty-on-11820700.php, last accessed Nov. 9, 2017 ("A Sugar Land company that calls itself the largest U.S. seller of promotional wristbands. . .agreed to plead guilty to conspiring to fix prices for customized products…"); https://www.wrist-band.com, last accessed Nov. 9, 2017 ("We are the largest and most reliable supplier in the field of customized wristband which is the most widely used promotional product,"); http://www.brandnex.com/themeb/aboutus.php, last accessed Nov.. 9, 2017 (". . .we take pride in being one of the largest manufactures [sic] of promotional products in the United States!")

[5] *See* http://www.thomasnet.com/articles/plastics-rubber/silicone-bracelet-design, last accessed Aug. 29, 2017.

32.     Most silicone wristband production facilities are located in China or other countries in Asia where production can occur very quickly and be rapidly shipped to the United States.   However, some production is claimed done in the United States of America, and Defendants and other competitors often charge a premium for customized silicone wristbands and lanyards that they claim to be "Made in the USA".

**D.  Customized Lanyards**

33.     Customized lanyards are produced in a method very similar to that of customized silicone wristbands, though instead of using extruded silicone rubber, most lanyards are made from polyester, nylon, or other easy-to-produce synthetic materials.  As with customized silicone wristbands, the customer can easily select the type and style of printing, along with other standard aspects of production, including the clasp and the badge holder.

34.     Turnaround times are similarly generally low, and can be ordered on little notice, often shipped from China or other countries in Asia.  Due to the ordering process, prices can be easily monitored online, just as with customized silicone wristbands.  Defendants Zaappaaz, Netbrands, and Gennex all use very similar online platforms to sell customized lanyards.

**E.  Customized Pin Buttons**

35.     Pin buttons are buttons or badges that attach to an article of clothing using an attached safety pin.  Most pin buttons are flat or rectangular, and they carry images or messages. Pin buttons are most commonly known from political campaigns, but today serve numerous other purposes.

36.     Customized pin buttons are produced in a method very similar to that of customized silicone wristbands and lanyards.  The pins are standardized across a range of options, such as size and shape, but the front message or image can be chosen almost entirely by

the customer. Some customized pin buttons are installed on keychains or with magnetic backings instead of using safety pins, though all are considered to be "customized pin buttons" within the industry meaning of the term.

37. Turnaround times are also generally low for customized pin buttons, and can be ordered on little notice, often shipped from China or other countries in Asia. Due to the ordering process, prices can be easily monitored online, just as with customized silicone wristbands and lanyards. Defendants Zaappaaz, Netbrands, and Gennex all use very similar online platforms to sell customized pin buttons.

**F.  The Nature of the Conspiracy**

38. Although the full scope of the conspiracy is not yet known to Plaintiff, the Houston Defendants, in particular, decided at least as early as 2014 to speak to each other as well as to competitors whom they sought to turn into co-conspirators over text messages and through social media messaging platforms in order to exchange information regarding the pricing of standard lots and to set prices between them.

39. On at least one occasion, the Houston Defendants met in person to set the price of at least silicone wristbands.

40. The Houston Defendants created a chat group specifically to communicate with each other as well as other parties. In communications, the Houston Defendants often indicated that they were looking to "stop[] under cutting [sic] each other as it only benefits google," and that unless they worked together "Google will rape us all."

41. As is indicated by the Information as to Custom Wristbands and the Information as to Christopher Angeles, Custom Wristbands and Angeles participated in these chat groups and platforms in order to exchange pricing information and to fix the price of customized

promotional products, including wristbands. *See USA v. Custom Wristbands, Inc.*, Case No. 4:17-cv-510, S.D. Tex., ECF No. 1; *USA v. Angeles*, Case No. 4:17-cv-509, S.D. Tex., ECF No. 1.

42. When new companies entered the market, the conspirators would initially move prices down to the price point of the new competitor until they could convince the new competitor to move up to their price point. Often, an agent of Defendants, frequently Netbrands' Mashnoon Ahmed ("Ahmed") or Gennex's Akhil Khurji ("Khurji") a/k/a Akil Kurji, would reach out directly to competitors and indicate that the Houston Defendants had all agreed on a price point, and that the competitor should adjust its pricing for the common good of all promotional products competitors.

43. One conversation between Defendants and a potential competitor, for example, involved having a director for one of the Defendants instruct a competitor to move his pricing for 1000 debossed wristbands up by $10 per order so as to come in line with Defendants' pricing.

44. At least three of Defendants' competitors reported this conduct to the Federal Bureau of Investigation and/or the Department of Justice. In June 2016, the FBI conducted simultaneous raids of Zaappaz, Netbrands, and Gennex.

## G. Defendants Zaappaaz and Makanojiya

44. Makanojiya has stated, in interviews, that he "founded [Wrist-Band.com] as a school business project that my friends and I came up with." Further, he states, "Silicone wristbands was a product [sic] at that time which could *only* be made in China. Also, the idea of wearing a silicone wristband was at its peak around the year 2008. That is what got us interested in the product."[6] (emphasis in the original)

---

[6] *See* https://www.americanbazaaronline.com/2015/01/19/school-project-spawned-multimillion-dollar-company-azim-makanojia/, last accessed Nov. 9, 2017.

45.    Further, he stated, "There was a significant amount of traffic was [sic] for the keyword *silicone wristbands*." *Id.* (emphasis in the original). This indicates that many customers seeking to order silicone wristbands primarily seek to do so online at first in order to compare on price and features.

46.    Makanojiya also stated:

"Our expertise is not in manufacturing even though we own our own factory in China. Our core expertise is in the technology side. We focus most of our energy on providing a platform for our customers to customize their products as easily as possible. We created a way to streamline the entire customization and logistics process in a way where there is a minimal friction in ordering customized products.
"The bracelets are produced in our factory in China which we have strategically located three miles away from the international airport to expedite the delivery of our products. Most of our customer's products are delivered in one business day from China to the US." *Id.*

47.    Additionally, Makanojiya stated,

"We have pioneered a way to give the customization opportunity to the general public; to create one wristband for as low as $2. This advancement in technology and hours of R&D has given millions of people and organizations the ability to raise over billions of dollars for their personal ventures, charities or various causes. Before Wristband.com, all of this was not possible. In all honestly, I believe it has been a win-win situation for both sides." *Id.*

48.    In spite of Makanojiya's self-professed accolades, however, Zaappaaz has been a frequent target of customer complaints, earning an "F" rating from the Better Business Bureau.[7]

## H. **Zaappaaz and Makanojiya's Relationship to Netbrands**

49.    While Makanojiya takes credit for creating the industry as it now exists, Defendant Netbrands has stated in previous court filings that Zaappaaz and Makanojiya directly stole its web platform and redirected its web traffic.

---

[7] *See* https://www.bbb.org/houston/business-reviews/internet-marketing-services/zaapaaz-llc-in-sugar-land-tx-90019860, last accessed Nov. 9, 2017.

50.     In 2010, Netbrands sued Zaappaaz, Makanojiya, and what appear to have been several of Makanojiya's family members who served as officers or directors of Zaappaaz for copyright infringement, unfair competition, fraud, conversion, and cyberpiracy in conjunction with their respectively silicone wristband businesses. *See Lightbeam, Inc. et al. v. Zaappaaz, LLC d/b/a Wrist-Band.com and d/b/a Customlanyard.net, et al.*, Case No. 4:10-cv-405, S. D. Tex., filed Feb. 10, 2010.

51.     In the Second Amended Complaint, Netbrands stated that Defendants (including Zaappaaz and Makanojiya) "individually and by and through a company they hired in India to copy Plaintiff's Websites 1 [24hourwristbands.com] surreptitiously placed multiple fake orders. . .in order to gain access to Plaintiff's customers back end [sic] and to gain an understanding of Plaintiff's order process work flow in order to ultimately, duplicate [sic] and steal Plaintiff's Website 1 [again, 24hourwristbands.com] content, design, text, graphics, applications, software, underlying source codes, services, and products, for the purpose of duplicating and stealing Plaintiff's proprietary information, systems [sic] and technology, and to offer the same or substantially similar services and products at Defendants' competing Website 1 [wrist-band.com]." *Id.*., ECF No. 29, ¶¶3.7-3.8.

52.     Netbrands further alleged that "Defendants even copied *verbatim* all or substantial portions of the content from Plaintiff's Website 1 and posted it word-for-word at Defendant's Website 1." *Id.* at ¶ 3.10 (emphasis in the original).

53.     Netbrands then alleged that "Defendants' Website 1 offered those same or substantially similar services and products for prices 30% to 40% less than the corresponding services and products offered at Plaintiff's Website 1, apparently to undercut Plaintiff's prices. Plaintiff Website 1 has since been forced to lower its prices to the same or substantially similar

prices offered at Defendants Website 1 for the corresponding services and products, Defendants are able to sell from the use of Plaintiffs [sic] proprietary and copyrighted material." *Id.* at ¶ 3.12.

54.     Netbrands also alleged that on multiple occasions it attempted to reconcile with Defendants before filing suit. *See id* at ¶¶ 3.14, 3.21.

55.     Plaintiffs and Defendants ultimately settled out of court and agreed to dismiss the lawsuit with prejudice. *Id.* at ECF Nos. 26-31. Both websites continued in operation and continued selling customized silicone wristbands, lanyards, and pin buttons.

56.     As stated s*upra*, Zaappaaz and Makanojiya have both indicated an intent to plead guilty to price-fixing in violation of Section 1 of the Sherman Act. The Houston Defendants have a long history of communication, including communication on pricing, internet ordering, and customer service. By Netbrands' admission, Zaappaaz and Makanojiya previously offered silicone wristbands at a substantial discount to Netbrands, until Netbrands sued for unfair competition. Following a civil settlement, the pricing pattern changed dramatically and now the Houston Defendants price silicone wristband orders at or near lockstep. Further, the two are geographically close to each other, and both have a history of illegal and/or questionable consumer conduct, as alleged elsewhere in this complaint.

**I.  Netbrands**

57.     Netbrands was founded in 2007 by Mashnoon Ahmed a/k/a Mash Noon Ahmed or Mash Noon, Aziz Mansoor ("Mansoor"), and Mueen Akhter ("Akhter") a/k/a Mueen Akhtar. In 2012, Netbrands stated that it had yearly sales of approximately $36 million[8].

---

[8] http://onemillioninthebank.com/a-few-wristbands-a-few-years-a-few-million-dollars/, last accessed Nov. 9, 2017.

58.     Ahmed and Mansoor, in particular, were regular participants in the chat room, and often spoke directly to Makanojiya, Angeles, and the CEO of Gennex, Khurji.

59.     Netbrands is not new to the realm of federal crimes.  In 2010, the United States, in the form of the Office of the Inspector General of the Social Security Administration, sued Netbrands and Mansoor under the Social Security Act and federal mail and wire fraud laws for attempting to mislead and defraud the public with the websites "www.ssnhome.com" and "ssnoffice.com."  *See United States of America v. Netbrands Media Corp. et al.,* Case No. 4:10-cv-2175, S.D. Tex., filed Jun. 18, 2010.

60.     In its complaint, the United States accused Netbrands of creating a website that gives the impression of being part of the Social Security Administration, as well as for charging for services through its website that are provided free of charge by the federal government (specifically applying for a social security card).  *See id.* at ECF No. 1, ¶¶ 2-6.

61.     Further, Netbrands, like Zaappaaz, has been a frequent target of consumer complaints, earning it an "F" rating from the Better Business Bureau[9].

62.     Additionally, Netbrands has held a long-running scam on its website, dating to at least 2012[10], that advertises "100 Free Wristbands with Every Order!" – usually with a fictional expiration of that same hour or same day.  However, Netbrands offers no additional explanation of the offer in a separate link or fine print for the terms of the "free" wristbands and routinely bills an additional substantial charge to the customer's order for the additional "free" wristbands.  Tactics like this show that Netbrands, like Zaappaaz, has a long history of deceptive practices.

---

[9] *See* https://www.bbb.org/houston/business-reviews/promotional-products-wearable/netbrands-media-corporation-in-houston-tx-90002118/, last accessed Nov. 9, 2017.

[10] *See* http://web.archive.org/web/20120404001120/http://24hourwristbands.com/, last accessed  Nov. 9, 2017.

63.     On information and belief, Netbrands has also routinely failed to remit charged state sales taxes to states and has commonly charged an undisclosed "insurance fee" on its invoices as well.

**J. Gennex**

64.     Gennex became registered with the State of Texas in 2011, and its CEO is Akhil Khurji a/k/a Akil Kurji.

65.     Khurji participated directly in the same chat groups, text messages, and meetings that the other Houston Defendants participated in, and directly set prices with his competitors during the Class Period.

66.     Khurji has directly stated in the past, regarding his relationship with the other Houston Defendants, "But yes, prices have been set between the three of us. We all met up."

**K. Custom Wristbands and Angeles**

67.     As stated *supra*, on August 22, 2017, Custom Wristbands and Angeles agreed to plead guilty to one count each of price-fixing in violation of Section 1 of The Sherman Act. As with the informations filed against Zaappaaz and Makanojiya, the informations against Custom Wristbands and Angeles claim that they held meetings and communicated via text messaging and online platforms to fix and maintain the prices of customized promotional products, including customized wristbands, between at least June 2014 and at least June 2016

68.     Further, on at least one occasion, Ahmed indicated in conversation with a competitor whom he sought to turn in to a conspirator that Custom Wristbands was also fixing prices as part of the conspiracy that is the subject of this complaint.

69.     At least two of Custom Wristbands' websites (speedywristbands.com and wristbandcreation.com) allow potential purchasers to place customized online orders and to get

instant pricing in a manner highly similar to that of the other Defendants' websites. Similarly, customers can place instant orders for custom lanyards on Custom Wristbands' website wristbandcreation.com.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who purchased customized silicone wristbands, customized lanyards, and/or customized pin buttons within the United States directly from one or more Defendants, or any of the predecessors, subsidiaries, or affiliates thereof, between June 1, 2014 and the present.

71.     Excluded from the Class are employees or agents of Defendants and their subsidiaries and affiliates, all persons who make a timely request to be excluded from the Class, and the judge to whom this case is assigned and his or her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

72.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

73.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

74.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff at this time, but may be ascertained from Defendants' records. Plaintiff is informed and believes that there are at least several thousand Class members. Class members may be notified of the pendency of this action by recognized, Court-approved notice

dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

75. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a) Whether Defendants engaged in the conduct alleged herein;

(b) Whether Defendants fixed, maintained, stabilized, or set prices for customized promotional products, including silicone wristbands, lanyards, and pin buttons;

(c) Whether Plaintiff and members of the Class were injured by Defendants' conduct; and

(d) Whether Plaintiff and members of the Class are entitled to equitable and injunctive relief.

76. Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants, as described above.

77. Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Classes she seeks to represent. Furthermore, Plaintiff has retained counsel competent and experienced in complex class action litigation. The Class's interests will be fairly and adequately protected by Plaintiff, who intends to prosecute this action vigorously, and by Plaintiff's skilled and experienced counsel.

78. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Class as a whole.

79. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

80.     Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIM FOR RELIEF
### Violation of Section 1 of The Sherman Antitrust Act
### (15 U.S.C. § 1)

81.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

82.     During the Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

83.     Specifically, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of customized promotional products in the United States.

84.     As a result of Defendants' unlawful conduct, prices for customized promotional products were raised, fixed, maintained, and stabilized in the United States.

85.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

86.     For the purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

(a)     participating in meetings and conversations to discuss each other's customized promotional products business; and

(b)     fixing, stabilizing, maintaining, or setting prices for customized promotional products.

87.     As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for customized promotional products, including silicone wristbands and lanyards, than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.     Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B.     Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

C.     Defendants and their co-conspirators be permanently enjoined and restrained from continuing and/or maintaining the conspiracy or agreement alleged herein;

D.     Treble and/or punitive damages as permitted by applicable law;

E.     An order requiring Defendant to pay both pre- and post-judgment interest on any

amounts awarded;

F.     An award of costs and attorneys' fees; and

G.     Such other or further relief as may be appropriate.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all issues so triable.

DATED:     November 27, 2017                    by: /s/ Warren T. Burns

Warren T. Burns
TX State Bar No. 24053119
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com

Fred Taylor Isquith
(*to be submitted pro hac vice*)
Thomas H. Burt
(*to be submitted  pro hac vice*)
**WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP**
270 Madison Ave.
New York, New York 10016
Tel: (212) 545-4600
Fax:(212) 686-0114
isquith@whafh.com
burt@whafh.com

Carl V. Malmstrom
(*to be submitted pro hac vice*)
Theodore B. Bell
(*to be submitted pro hac vice*)
**WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLC**
70 W. Madison St., Suite 1400
Chicago, Illinois 60602
Tel: (312) 984-0000
Fax:(312) 212-4401
tbell@whafh.com
malmstrom@whafh.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Riley A. Conlin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
rconlin@gustafsongluek.com

Attorneys for Plaintiff and the Proposed
Class